UNITED STATES DISTRICT COURT
STATE OF MINNESOTA

---

Faduma M. Farah,

Case No. _____

Plaintiff,

**COMPLAINT**

v.

**JURY TRIAL DEMANDED
UNDER FRCP 38(b)**

Heather Weyker, acting in her individual capacity
as a St. Paul Police Officer, John Bandemer, acting in
his individual and official capacities as a St. Paul Police
Sergeant, John Does 1-2, in their individual
capacities as St. Paul Police officers, John Does
Does 3-4, in their individual and official capacities as
supervisory members of the St. Paul Police Department, and
The City of St. Paul,

Defendants.

---

For her Complaint, Faduma M. Farah ("Farah") states and alleges as follows:

1.      This is an action for money damages for the violation of Farah's well-settled rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution. Defendant Heather Weyker ("Weyker") fabricated evidence against Farah and many other innocent victims in order to secure a federal indictment that ultimately led to Farah spending approximately 10 days in jail, nearly a year and a half on home detention with ankle monitoring and being labeled as a "child sex trafficker." But for the testimony and other evidence falsely manufactured by Weyker, no probable cause existed to detain or otherwise restrict Farah's liberty. Weyker's misconduct displayed an evil motive or intent

and displayed reckless or callous indifference to Farah's federally protected rights. No reasonable officer would undertake a lengthy, repeated course of deception, manipulation, false statements and the fabrication or manufacture of evidence that Weyker did, and was allowed to do by her supervisors and the City of St. Paul, in this case.

2. Farah brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth, Fourth, Fifth and Sixth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this cause of action. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and (2), and as to the *Bivens* count, 28 U.S.C. §§ 1391(e)(1)(A) and (B).

3. Farah is now 31 years old and is a permanent, legal resident of the United States residing in the State of Minnesota.

4. Upon information and belief, at all times material hereto, Weyker was a United States citizen residing in the State of Minnesota. Weyker, acting under color of state law and in her individual capacity, subjected Farah to constitutional deprivations causing her to suffer severe irreparable harm.

5. Upon information and belief, at all times material hereto, John Bandemer ("Bandemer") was a United States citizen residing in the State of Minnesota. Bandemer, acting under color of state law and in his individual and official capacities, subjected Farah to constitutional deprivations causing her to suffer irreparable harm.

6. John Does 1-2 are currently unknown members of the St. Paul Police Department who, upon information and belief, failed to intervene to prevent the constitutional violations perpetrated by Weyker. John Does 1-2 had reason to know that

such violations were occurring and had a realistic opportunity to intervene. These defendants are sued in their individual capacity.

7. John Does 3-4 are currently unknown members of the St. Paul Police Department with supervisory responsibility for defendants Weyker and/or Bandemer. John Does 3-4 had actual or constructive notice of the individual defendants' constitutional violations. These defendants are sued in their individual and official capacities.

8. The City of St. Paul is a municipality duly incorporated under the laws of the State of Minnesota.

9. Farah, whose parents are Somalian, was born in Ethiopia.

10. Farah's family left Ethiopia for Kenya, where they lived in refugee camps.

11. While in Kenya, Farah taught herself English and dreamed of the day she would be able to leave the camps behind and move to the United States.

12. In 1999, after Farah was granted refugee status due to the conditions in Kenya, she came to the United States with her parents and six of her seven siblings. The day Farah learned she had been granted refugee status was the happiest day of her life.

13. Farah's family settled in Minnesota.

14. In 2000, at an early age, Farah entered into a Somalian marriage and, shortly thereafter, moved with her husband to Tennessee, where she began working at publishing company and had three children.

15. Many years after moving to Tennessee, Assistant U.S. Attorney Van Vincent and others made contact with Farah. They would show up at Farah's apartment and also called her on the phone. During one of the visits, Assistant U.S. Attorney Van Vincent

showed Farah numerous photographs of individuals asking Farah her about their identities, as well as various nicknames. Of the individuals depicted in the photographs, Farah knew her ex-husband and recognized a small number of the other individuals as members of the Somali community. The authorities also discussed putting Farah in witness protection if she would testify against the individuals. Farah declined as she did not possess truthful information relating to criminal activity of the individuals depicted in the photographs or with the associated nicknames.

16. During the same time period, Farah noticed vehicles following her around Tennessee.

17. Several months before her November 2010 arrest, under the pressure of Assistant U.S. Attorney Van Vincent and others, Farah took a lie detector test. She was told without proof that she failed the test. She was then threatened that she would never see her children again if she did not work with the authorities. Again, she declined.

18. For approximately one year, Farah did not hear from Van Vincent or the others who had been pressuring her.

19. Then, on the morning of November 8, 2010, Defendant Weyker, along with FBI agents, Homeland Security agents and US Marshals, showed up at Farah's apartment in Nashville, Tennessee, with their guns out, and arrested Farah in front of her three young children.

20. Farah, who was only wearing a thin and immodest Somali nightgown, was handcuffed, placed in a chair in front of her three children – then 3, 5 and 8 years old – and berated, particularly by Defendant Weyker.

4

21.   Eventually, Farah was bussed downtown to an immigration building and child services took her three children.

22.   A continuing course of unconstitutional conduct by all defendants, stemming from Weyker's fabrication of evidence, caused Farah's arrest.

23.   Farah was then detained in jail in Bowling Green, Kentucky.

24.   Ultimately Farah was released from jail.  U.S. Magistrate Judge John Bryant issued an Order Setting Conditions of Release.  Under the Conditions, Farah was placed on a home detention monitoring program restricting her to her residence at all times except for employment; education; religious services; medical, substance abuse or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the pretrial services office or supervising officer.

25.   Farah was ordered to wear a location monitoring technology device, a  GPS enabled ankle bracelet.

26.   Farah was ordered to permit the pretrial services officer to visit her at any time at home or elsewhere, among other restrictions on her liberty.

27.   Further, Farah was ordered have any contact with her husband, who was also arrested on November 8, 2010.

28.   These conditions remained in place until for nearly a year and a half.

29.   Farah and many others were indicted, arrested and detained based on completely fabricated allegations of wide-ranging child sex trafficking conspiracy.  Her days in jail and on home confinement followed.

30.    The defendants failed to act in an objectively reasonably manner as described herein.

31.    Fabricating evidence to indict, arrest, detain and prosecutre Farah is a violation of clearly established federal law.

32.    The arrests were newsworthy for defendants Weyker and Bandemer. Bandemer was the lead sergeant of the St. Paul Police Department's vice unit and had supervisory responsibility over Weyker. Weyker was the lead investigator on this case, which she and Bandemer viewed as the unit's biggest case. Many victims, including Farah, needlessly sacrificed years of their liberty so Weyker and Bandemer could quench their professional thirst for indictments.

33.    Farah's November 8, 2010 arrest came after she was charged in a Superseding Indictment dated November 3, 2010. The Superseding Indictment charged Farah with two counts of conspiracy as to sex trafficking of a minor under 18 U.S.C. § 1594(c), substantive sex trafficking of a minor under 18 U.S.C. § 1591(a) and making a material false statement under 18 U.S.C. § 1001.

34.    On May 4, 2011, a Second Superseding Indictment ("Indictment") was filed, which included the same four charges against Farah.

35.    The two counts of conspiracy as to sex trafficking of a minor under 18 U.S.C. § 1594(c) were taken to trial against Farah, which began in March 2012.

36.    Count 11 of the Indictment, substantive sex trafficking of a minor under 18 U.S.C. § 1591(a), was dismissed upon motion of the Government.

37.    Count 23 of the Indictment, making a material false statement under 18 U.S.C. § 1001, was severed from the conspiracy sex trafficking Counts and was later dismissed.

38.    The Indictment's conspiracy as to sex trafficking counts against Farah only involved *one* female listed as "Jane Doe 1."

39.    On June 24, 2010, Jane Doe 1 supposedly identified Farah as "Naana," someone Jane Doe 1 claimed to have encountered in Nashville, Tennessee, who coordinated a prostitution business there.

40.    The application of the supposed nickname "Naana" as to Farah occurred during an interview with Defedant Weyker and Jane Doe 1, a person who was unknown to Farah.

41.    On June 24, 2010, Defendant Weyker showed Jane Doe 1 six photographs, of which only two were women. One of the two women was Farah. The photograph of Farah was shown to Jane Doe 1 in a uniquely different and much more suggestive manner than the other photographs – Defendant Weyker used her Blackberry to pull up and show Jane Doe 1 a photograph of Farah.

42.    Judge Haynes' Memorandum in *U.S. v. Farah, et al.*, Case No. 3:10-00260, Doc. No. 1392-1 filed February 15, 2012 concluded that "Weyker's use of a digital photograph showup of Farah and nondigital photographs of the other persons, that included only one woman, was unduly suggestive."

43.    Interestingly, Jane Doe 1 did not testify at trial because, upon information and belief, she was unfit or incredible and/or refused to testify.

7

44. Instead, the centerpiece of Weyker's fabricated case against Farah pivoted to Jane Doe 5.

45. This is more than curious because the Indictment and charges therein brought against Farah did not include *any* allegations or references connecting Jane Doe 5 to Farah.

46. When describing how Jane Doe 5 became connected to the fabricated sex trafficking story, the Sixth Circuit explained:

> "importantly, when Officer Weyker and the FBI task force got involved, and Jane Doe 2 started talking about sex and prostitution, the Nashville federal prosecutor was able to put her story together with certain other witnesses, most notably Jane Doe 5, a Nashville resident, and then charged [30 individuals] with felony sex trafficking." *U.S. v. Fahra*, 2016 WL 807380 at *3 (6th Cir. Mar. 2, 2016).

47. At trial, "Jane Doe 5 identified eight defendants by name and accused six of sex trafficking crimes…" She testified that "between 2003 and 2006, while she was living in an apartment with [Farah]…some men came there and she had sex with them because she liked them, but unbeknownst to her [Farah] collected money for that." *U.S. v. Fahra*, 2016 WL 807380 at *6 (6th Cir. Mar. 2, 2016).

48. Further, Jane Doe 5 testified that Farah operated a prostitution ring at her Tennessee apartment, gave her estimates as to ages of females at Farah's apartment and put forth other testimony matching the Government's theory that Farah was part of the fabricated sex trafficking conspiracy that continued to Nashville in 2010. *U.S. v. Adan*, 913 F.Supp.2d 555, 572 (M.D. Tenn. 2012).

49. There was never any such conspiracy and Farah never engaged in any attempt to have Jane Doe 1 or Jane Doe 5 or any other individual engage in commercial sex. There

8

was simply no intention, desire or expectation that Jane Doe 1 or Jane Doe 5 or any other individual would engage in commercial sex. Fabricated evidence formed the bases of these false allegations against Farah.

50. Farah had no material involvement with Jane Doe 1 or Jane Doe 5.

51. Farah did not know, and, to this day, does not know Jane Doe 1. Likewise, Jane Doe 1 did not know Farah.

52. Prior to her arrest, Farah had only known of Jane Doe 5. Jane Doe 5 was a part of the small Somali community in Nashville, Tennessee and Jane Doe 5 knew Farah's cousin.

53. Not surprisingly, Farah was acquitted of conspiracy as to child sex trafficking by the jury.

54. Jane Doe 5 was later deemed "unworthy of belief" by the Sixth Circuit. The Court stressed, "Jane Doe 5 has been diagnosed as insane and was off her medication at trial. She did not know what day or month it was, she misidentified or could not identify many defendants, she contradicted herself repeatedly (on major issues, such as whether or not she had sex for money), and she argued with counsel over the smallest of details." *U.S. v. Fahra,* 2016 WL 807380 at *6 (6th Cir. Mar. 2, 2016).

55. Further, Jane Doe 5, along with the prosecution's other principal witness, Jane Doe 2, "repeatedly contradicted, disavowed, and refuted their own testimony, while other portions of their testimony defied belief or were rendered implausible by indisputable contradictory evidence." *U.S. v. Fahra,* 2016 WL 807380 at *4 (6th Cir. Mar. 2, 2016).

9

56.    Additionally, the Sixth Circuit provided that "[a]ccording to all of the evidence, Jane Doe 5 [was] not connected to Jane Doe 2 in any way: they never met, they were never at the same location, and their stories [did] not intersect." *U.S. v. Fahra*, 2016 WL 807380 at *6 (6th Cir. Mar. 2, 2016).

57.    Defendant Weyker cultivated a deep and manipulative relationship with Jane Doe 1 and other Jane Doe witnesses who she referred to as "My girls" in a news interview about the vice unit's biggest indictment.

58.    It was through these relationships that Weyker was able to fabricate and manufacture evidence regarding Jane Doe 1 and the supposed "connection" between Jane Does 2 and 5.

59.    Weyker was maniacal in her pursuit and manipulations of Jane Doe 1, Jane Doe 2 and Jane Doe 5, without regard for the truth of the allegations.

60.    Weyker was allowed to pursue the fabricated and manufactured evidence and false allegations against Farah with the ratification by, and approval of, the other defendants named herein.

61.    With regard to Farah, the overwhelming majority of the material evidence supporting her indictment was fabricated and then was supplied to federal prosecutors by Weyker.

62.    The United States Attorney's Office in the District of Minnesota correctly declined prosecution.[1]  But the U.S. Attorney's Office in the Middle District of Tennessee

---

[1] The Sixth Circuit took care to observe that: "Finally, it is curious that even though Officer Weyker (the lead agent), Jane Doe 2 (the principal victim-witness), and all but a few of the 30 defendants reside in Minnesota, and an overwhelming portion of the events at

was beguiled by defendants Weyker and Bandemer, among others, and undertook to prosecute Farah and others based on a fabricated story and evidence.

63. Weyker and the other defendants were undeterred and sold the fabricated case to an Assistant United States Attorney in Tennessee. The defendants began with the false conclusion that Farah and others were felony sex traffickers and worked backwards to violate their constitutional rights by concocting stories for putative victims like Jane Doe 1, Jane Doe 2 and Jane Doe 5 and coaching them to testify – albeit unbelievably and inconsistently – in support of the Indictment.

64. Yet, the Jane Does were not the only individuals with credibility issues.

65. Defendant Weyker's credibility was completely destroyed by the time of trial in March 2012 such that she, the Government's lead investigator on this mega-trafficking case, was also not called as a witness. This fact was notable to the Chief Judge of the United States District Court for the Middle District of Tennessee and the three judge panel that heard the case at the Sixth Circuit Court of Appeals.

66. Importantly, the jury got it right and, as the the Sixth Circuit noted, the verdict, which acquitted Farah, "indicates that the jury…rejected all of the charges supported by Jane Doe 5's testimony." *U.S. v. Fahra*, 2016 WL 807380 at *9 (6th Cir. Mar. 2, 2016).

67. Weyker and the other defendants violated Farah's constitutionally guaranteed due process rights by their egregious misconduct.

---

issue occurred in Minnesota , the federal prosecutor in Minnesota did not prosecute this case in Minnesota." *U.S. v. Fahra*, 2016 WL 807380 at *2 (6th Cir. Mar. 2, 2016).

68.     Farah would have never been indicted had Weyker not fabricated evidence, cultivated and manipulated Jane Doe 1, Jane Doe 2 and Jane Doe 5, manufactured testimony and mislead federal authorities.

69.     Farah would never have been detained had Weyker not fabricated evidence, cultivated and manipulated Jane Doe 1, Jane Doe 2 and Jane Doe 5, manufactured testimony and mislead federal authorities.

70.     Farah would never have been put on home detention and GPS ankle monitoring and otherwise had her freedom restricted had Weyker not fabricated evidence, cultivated and manipulated Jane Doe 1, Jane Doe 2 and Jane Doe 5, manufactured testimony and mislead federal authorities.

71.     After the trial began, the Government belatedly disclosed voluminous evidence, including thousands of pages of rough notes from defendant Weyker.

72.     Almost one year before the trial the Government told the district court that it has produced all of the material in the case in its possession.  Nonetheless, Weyker's rough notes and other exculpatory material was not produced.  Weyker kept thousands of pages of rough notes.  But only one page contained any reference to commercial sex, which related to Jane Doe 2.  Later, Weyker fabricated such evidence in police reports, affidavits and case-related memoranda and manufactured such evidence through manipulation and coercion of the Jane Does.

73.     Wekyer violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to advise prosecutors that she had fabricated evidence in order to secure the Indictment against Farah. This constitutes a denial of due process.

74.     Upon information and belief, Weyker further violated *Brady* and denied Farah due process by suppressing other evidence favorable to her in bad faith.

75.     Weyker violated Farah's right to a fair trial by fabricating evidence that was likely to influence a jury and then forwarding that information to prosecutors.  As a result, Farah suffered a deprivation of liberty.

76.     Defendants City of St. Paul, Bandemer, and supervisory defendants John Does 3-4 (the "supervisory defendants") ratified and approved Weyker's misconduct as evidenced by their failure to react or intervene when the United States District Court for the Middle District of Tennessee, prior to trial, "expressed serious concerns about the truthfulness of Weyker's testimony to the grand jury." *United States v. Mohamud*, Case No. 3:10-CR-00260, 2013 WL 1935506, at fn. 6 (M.D. Tenn. May 9, 2013).

77.     Even earlier, the district court issued another opinion criticizing Weyker for lying thereby providing actual notice to her supervisors and the City of St. Paul of Weyker's misconduct.  The court wrote:  "Earlier, this Court found serious issues about the testimony of [the] Government's lead agent in this action.  *See* Docket Entry No. 1392 (referring to a Memorandum dated February 15, 2012).  This concern arose again at a July 31, 2012 detention hearing reflecting her misrepresentations of the facts about the Defendant Abdifatah Sharif Omar that resulted in his release from detention under certain conditions.  Finally, serious credibility issues arise from Jane Doe Two's testimony that involved the Government's lead agent." *U.S. v. Adan*, 913 F.Supp.2d 555, at FN 10 (M.D. Tenn. 2012).  Again, this striking advisory by the Chief Judge of this federal court failed to provoke any action or intervention by the other defendants.

13

78. The supervisory defendants held a superior position over defendant Weyker while she concocted this imaginary mega-case against Farah and the other victims. These defendants were aware of Weyker's fabrication of evidence and the court's recognition of this fact, but they repeatedly approved, ratified and acquiesced in the pattern of misconduct thereby allowing Weyker to proceed unchecked. Defendants Bandemer and John Does 3-4 acted with deliberate indifference in their supervisory role to the rights of Farah and the other victims.

79. The supervisory defendants and the City of St. Paul were deliberately indifferent to Weyker's pattern of unconstitutional conduct. By at least February 15, 2012, these defendants had actual knowledge that the lead investigator in the City's crown jewel minor sex trafficking case had indeed fabricated the evidence necessary to charge and detain Farah and others.

80. The City of St. Paul and the supervisory defendants were constitutionally obligated to stop Weyker, but had neither the courage or the will to do so.

81. Defendant Weyker remains an officer of the St. Paul Police Department, where she continues to work a regular shift.

82. The supervisory defendants in their official capacity and the City of St. Paul violated *Monell v. Dept. of Social Servs.* by exhibiting deliberate indifference to Weyker's pattern of constitutional misconduct.

83. The supervisory defendants in their individual capacity violated Farah's constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution as described in the counts below.

14

84.    John Does 1-2 in their individual capacity violated Farah's constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution as described in the counts below.

85.    Defendants' unconstitutional misconduct caused Farah to be falsely arrested on November 8, 2010 and falsely imprisoned, after which she was released on home detention with GPS monitoring and other restrictions on her liberty.

86.    At the time of her arrest, child services took Farah's three children away. They were placed in various foster homes for approximately 2.5 months. This was an act that particularly tormented Farah. She began having suicidal thoughts and once, took a number of pills and was found passed out on the ground by a friend, which required a trip to the emergency room.

87.    In addition to having to fight to get her children back, Farah was facing a life sentence, could not sleep, lost approximately 30 pounds, was under incredible stress and was constantly judged and tormented in public due to being labeled a child sex trafficker.

88.    Further, as a result of her arrest, Farah lost her job as an editor of the publishing company where she had worked for several years as a temporary contract worker and ultimately an employee and her Section 8 housing benefits.

89.    Additionally, on the date of her arrest, her husband was also arrested for similar charges. Eventually, the couple got a divorce.

90.    Farah has now dealt with these fabricated stories of her involvement with a mega child sex-trafficking ring for nearly six years, which caused irreparable damage to her reputation, dignity and relationships.

15

91.    Despite Farah's attempts to shield her children from the allegations behind her arrest and home detention, at least one of her children is now at an age where she and her friends understand what has been stated about Farah in the media and Internet. Farah's oldest daughter, now 14, has begun asking her hard questions regarding her "connection" to child sex-trafficking. Farah's daughter has connected these stories with November 8, 2010 – the horrible day when her mother was handcuffed, berated, pushed around and taken from her.

92.    As a direct and proximate result of the defendants' unconstitutional acts and omissions, Farah suffered a shocking loss of liberty and she will continue to suffer the effects associated with being charged, detained, convicted, incarcerated and on home detention/monitoring for child sex trafficking as an innocent woman.

93.    Defendant Weyker knew that Farah was never engaged in any conspiracy to traffic minors for commercial sex. Without Weyker's conscious decision to orchestrate a fictitious case against Farah and the other victims, Farah would never have been indicted, arrested, imprisoned or placed on home detention/monitoring in the underlying federal criminal case.

## COUNT ONE
### 42 U.S.C. § 1983
### FOURTH, SIXTH AND FOURTEENTH AMENDMENT
### VIOLATIONS AGAINST HEATHER WEYKER

94.    Farah incorporates the preceding allegations as if fully stated herein.

95.   Weyker's misconduct, including fabrication of evidence while acting under color of state law, directly and proximately caused violations of Farah's Fourth Amendment rights to be free from unreasonable search and seizure, false arrest and false imprisonment.

96.   Weyker's misconduct, including fabrication and withholding of evidence while acting under color of state law, directly and proximately caused a violation of Farah's Sixth Amendment right to a fair trial.

97.   Weyker's misconduct, including fabrication and withholding of evidence while acting under color of state law, directly and proximately caused violations of Farah's Fourteenth Amendment due process rights

98.   Weyker committed the above acts either maliciously or with reckless disregard for whether Farah's rights would be violated.  Weyker's misconduct was so egregious that it shocks the conscience.

99.   As a direct and proximate result of Weyker's acts and omissions, Farah suffered a profound loss of liberty, endured great bodily and mental harm both past and future, temporary loss of her children, lost wages, lost value of working time, loss of enjoyment of life and a fundamental constitutional injury.  Farah seeks compensatory damages in an amount exceeding Four Million ($4,000,000.00) Dollars.

100.   Farah claims punitive damages against Weyker in an amount exceeding Four Million ($4,000,000.00) Dollars.  Punitive damages are available as a matter of right under *Smith v. Wade*, 461 U.S. 30 (1983), and such damages are not subject to the pleading requirements or differing standard of proof set forth in Minn. Stat. § 549.20.

101.    Farah is entitled to recovery of her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT TWO
## 42 U.S.C. § 1983
## FAILURE TO INTERVENE AGAINST DEFENDANTS
## JOHN BANDEMER AND JOHN DOES 1-2
## IN THEIR INDIVIDUAL CAPACITY

102.    Farah incorporates the preceding allegations as if fully stated herein.

103.    Defendants Bandemer and John Does 1-2 had an affirmative duty to intervene to protect the constitutional rights of Farah from infringement by Weyker.

104.    These defendants had reasons to know that the constitutional violations committed by Weyker in Count One were occurring and they had a realistic opportunity to intervene.

105.    Defendants Bandemer and John Does 1-2 failed to intervene and are therefore liable for the same.

106.    These defendants committed the above misconduct either maliciously or with reckless disregard for whether Farah's rights would be violated.

107.    As a direct and proximate result of defendants' failure to intervene, Farah suffered a profound loss of liberty, temporary loss of her children, endured great bodily and mental harm both past and future, wage loss, lost value of working time, loss of enjoyment of life and fundamental constitutional injury.  Farah seeks compensatory damages in an amount exceeding Four Million ($4,000,000.00) Dollars.

108.    Farah claims punitive damages against Bandemer and John Does 1-2 in an amount exceeding Four Million ($4,000,000.00) Dollars.  Punitive damages are available as a

18

matter of right under *Smith v. Wade*, 461 U.S. 30 (1983), and such damages are not subject to the pleading requirements or differing standard of proof set forth in Minn. Stat. § 549.20.

109.    Farah is entitled to recover of her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT THREE
## 42 U.S.C. § 1983
## SUPERVISORY LIABILITY AGAINST DEFENDANTS
## JOHN BANDEMER AND JOHN DOES 3-4
## IN THEIR INDIVIDUAL CAPACITY

110.    Farah incorporates the preceding allegations as if fully stated herein.

111.    Defendants Bandemer and John Does 3-4 are members of the St. Paul Police Department with supervisory responsibility over defendant Weyker.

112.    The supervisory defendants had actual or constructive notice of Weyker's constitutional misconduct.

113.    The supervisory defendants, under color of state law, acted with deliberate indifference to or authorized the egregious violations of Farah's well-established constitutional rights by Weyker.

114.    The supervisory defendants failed to take any remedial action in the face of notice of these continuing violations.

115.    The supervisory defendants committed the above misconduct either maliciously or with reckless disregard for whether Farah's rights would be violated.

116.    As a direct and proximate result of defendants' failure to supervise, Farah suffered a profound loss of liberty, temporary loss of her children, endured great bodily and mental harm both past and future, lost wages, lost value of working time, loss of enjoyment

19

of life and fundamental constitutional injury. Farah seeks compensatory damages in an amount exceeding Four Million ($4,000,000.00) Dollars.

117. Farah claims punitive damages against Bandemer and John Does 3-4 in an amount exceeding Four Million ($4,000,000.00) Dollars. Punitive damages are available as a matter of right under *Smith v. Wade*, 461 U.S. 30 (1983), and such damages are not subject to the pleading requirements or differing standard of proof set forth in Minn. Stat. § 549.20.

118. Farah is entitled to recover of her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988

## COUNT FOUR
### *BIVENS* CLAIMS AGAINST DEFENDANT HEATHER WEYKER FOR FOURTH, FIFTH AND SIXTH AMENDMENT VIOLATIONS

119. Farah incorporates the preceding allegations as if fully stated herein.

120. The United States Supreme Court in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), held that a violation of a person's constitutional rights by federal officers, acting under color of federal law, gives rise to a federal cause of action for damages for the unconstitutional conduct.

121. As such, to the extent that Weyker may be deemed a federal actor, Farah has a *Bivens* right to recover damages against Weyker for the constitutional violations committed by Weyker in Count One.

122. Farah's due process claims in Count One are cognizable under the Fifth Amendment to the United States Constitution.

20

123.   Weyker committed the above acts either maliciously or with reckless disregard for whether Farah's rights would be violated.  Weyker's misconduct was so egregious that it shocks the conscience.

124.   As a direct and proximate result of Weyker's acts and omissions, Farah suffered a profound loss of liberty, temporary loss of her children, endured great bodily and mental harm both past and future, lost wages, lost value of working time, loss of enjoyment of life and fundamental constitutional injury.  Farah seeks compensatory damages in an amount exceeding Four Million ($4,000,000.00) Dollars.

125.   Farah claims punitive damages against Weyker in an amount exceeding Four Million ($4,000,000.00) Dollars.  Farah seeks punitive damages because Weyker's misconduct was motivated by evil motive intent or involved reckless or callous indifference to her federally protected rights.  Weyker acted in the fact of a perceived risk that her actions would violate federal law.

126.   Farah is entitled to recovery of her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

**COUNT FIVE**
***MONELL* VIOLATIONS AGAINST THE
CITY OF ST. PAUL, JOHN BANDEMER AND
JOHN DOES 3-4 IN THEIR OFFICIAL CAPACITY**

127.   Farah incorporates the preceding allegations as if fully stated herein.

128.   Upon information and believe, the supervisory defendants are policy makers with the power to make official policy on particular issues.

129. The supervisor defendants and the City of St. Paul, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern, or practice on the part of its officers, including defendants Weyker and Bandemer, of improperly fabricating evidence.

130. Through the supervisory defendants' and the City of St. Paul's ratification and approval of its officers' actions, in both this case and others, and by failing to discipline its officers, there has been a policy, custom or practice of fabricating evidence to establish probable cause without sanction or consequence.

131. The constitutional deprivations suffered by Farah were directly and proximately caused by the aforementioned acts and omissions and by these defendants' customs, patterns and/or practices.

132. As a direct and proximate result of these defendant's acts and omissions, Farah suffered a profound loss of liberty, temporary loss of her children, endured great bodily and mental harm both past and future, lost wages, lost value of working time, loss of enjoyment of life and fundamental constitutional injury. Farah seeks compensatory damages in an amount exceeding Four Million ($4,000,000.00) Dollars.

133. Farah is entitled to recover of her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

WHEREFORE, plaintiff Faduma M. Farah prays for judgment against the defendants as follows:

1.      As to Count One, a money judgment against Heather Weyker in an amount exceeding Eight Million ($8,000,000.00) Dollars, together with her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

2.      As to Count Two, a money judgment against John Bandemer and John Does 1-2 in an amount exceeding Eight Million ($8,000,000.00) Dollars, together with her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

3.      As to Count Three, a money judgment against John Bandemer and John Does 3-4 in an amount exceeding Eight Million ($8,000,000.00) Dollars, together with her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

4.      As to Count Four, a money judgment against Heather Weyker in an amount exceeding Eight Million ($8,000,000.00) Dollars, together with her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

5.      As to Count Five, a money judgment against the City of St. Paul, John Bandemer and John Does 3-4 in an amount exceeding Four Million ($4,000,000.00) Dollars, together with her costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

6.      For such other and further relief as this Court deems just and equitable.

GASKINS BENNETT BIRRELL SCHUPP L.L.P.

Date: 5-4-16

*Robert Bennett*

Robert Bennett, #6713
Andrew S. Birrell, #133760
Andrew J. Noel, #322118
Paul C. Dworak, #0391070
Kathryn H. Bennett, #0392087
333 South Seventh Street, #3000
Minneapolis, MN 55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
abirrell@gaskinsbennett.com
anoel@gaskinsbennett.com
pdworak@gaskinsbennett.com
kbennett@gaskinsbennett.com


GARY R. WOLF, ATTORNEY AT LAW

Date: 5/4/16

*Gary R. Wolf*

Gary R. Wolf, #0129136
Barristers Trust Building
247 Third Avenue South
Minneapolis, MN 55415
Telephone: 612-338-7090
gary@garywolflaw.com

24